Good morning, Your Honors. Counsel, may it please the Court. My name is Krista Hart. I represent Mr. Lesueur, the appellant in this case, and my goal here is to reserve three minutes for rebuttal. The first question I will address is whether the initial entry into Mr. Lesueur's home earlier in the day without a warrant was excused by the emergency aid doctrine. And the second question to address would be if, in fact, it was not excused and the presence of the firearm was excised from the affidavit in support of the search warrant, was there probable cause to support a search later in the day? So regarding the first question, the first prong of the snipe test is whether the officers had an objectively reasonable basis to enter the home under the emergency aid doctrine. That is, whether there was an immediate need to protect others or themselves from serious harm. And as the Supreme Court put it in Brigham City v. Stewart, officers may enter a home without a warrant to render emergency assistance to an injured officer. And the third prong of the snipe test is whether there was a need to protect an occupant from imminent injury. Here, there was no need to protect Ms. Lesueur from imminent injury. The officers approached the home, they knocked on the door, and first they were at the home based on... The mother told someone and someone told the police. So the police didn't initiate going out there. They were dispatched out there because they were told that Lesueur had kidnapped E.L. and was holding her hostage in her mobile home. I think Officer Chad Schaefer's prior experience with the domestic trouble between Lesueur and E.L., I think he had on a prior occasion, he was asked to investigate Lesueur because Lesueur reported E.L. missing and Schaefer suspected foul play. So they had had some prior contact. The police had knowledge that a 20-day domestic violence protective order also protected E.L. from having any contact with Lesueur. The police knew that Lesueur's conditions of relief from a previous criminal case prescribed him from entering the home. Schaefer's understanding that E.L. previously had been suicidal, had mental issues, and suffered from bouts of depression, and after the officers knocked on the door and identified themselves in response to Lesueur's question, Lesueur and E.L. went silent. When E.L. met with the officers at the door in her bathrobe, she appeared to be very uneasy, scared, and kind of skittish, according to the officers, and made real quick hand movements and head movements and seemed reluctant to answer questions. So they have all of that when they go to the door, right? They have some of that. I'm not entirely sure that's 100% accurate. So the history that we know that's part of the record is that the officer, Schaefer, who had been to the house, was familiar with the couple. We know that sometime in early January, Mr. Lesueur was arrested. On January 17th, he was released on conditions of release. According to those conditions of release, which are in the supplemental excerpts of record at page 15, he was ordered, that's the 17th, essentially to give Ms. Lesueur about 24 hours to get out of the home, so he was to stay away from the home until 7 p.m. the following day. January 18th, and she was to find a new place to live. A week later, on January 24th, Ms. Lesueur is back at the home in violation of, although it's the order, condition of release against Mr. Lesueur, she, according to the record, was present in the courtroom when that order was issued, and she made the choice to go to Mr. Lesueur's home. She assaulted Mr. Lesueur at his home on that day. He called the police. The police came, but seeing no visible injury to Mr. Lesueur, did not arrest Ms. Lesueur. Mr. Lesueur went and got a domestic violence restraining order against Ms. Lesueur on January 24th, and that was granted on the basis of Mr. Lesueur's live testimony under oath before a judge in an Alaska court. That was served on Ms. Lesueur. Then, later, she is again back at the home. Now, yes, she contacted her mother, and said she was being held hostage. Why is it not enough for officers to go to the house, and even if she looks like she's okay, to check it out by going in? It's okay for them to go to the house. They knocked on the door. Mr. Lesueur didn't open the door, but he verbally answered. He asked, who is it? Said, it's the police. Police knock again, and then Ms. Lesueur answers the door. So, Mr. Lesueur is inside the house. He is not stopping Ms. Lesueur from answering the door. He's not stopping Ms. Lesueur from interacting with the police or leaving the house, apparently. The police see Ms. Lesueur. They interact with her at the door. She has no visible signs of injury. She's skittish. She seems reluctant to answer questions. But at that point, then, it's the officer's obligation to determine what is happening. Instead, they just went in to get to the bottom of what was going on. What's wrong with that? In the sense of, let's say you've got a hostage situation. Somebody comes to the door. They're skittish. They don't have any injuries, but there might be somebody with a gun in the next room saying, don't tell them anything. So, what's wrong with the officers going in under that scenario and checking it out? I mean, you don't have to show injury, I don't think, to invoke the emergency doctrine. No, indeed, you do not. But you have to have an objective, a reasonable belief that the person is about to be injured. There is no evidence that they even asked her if she wanted to leave. There's no evidence that they had any kind of, other than the quote-unquote, she was reluctant. But the officers are in danger in a volatile situation. There could be other people in the house. There could be someone else with a gun that, if they don't secure, if they don't keep their eyes on both of the people, someone could go, I mean, domestic violence things go upside down all the time. On the people that are there, they have murder-suicides, they shoot officers, they do all sorts of things. And so it's, you know, it's, they're very volatile situations. They can be, but here, Officer Schaefer, the officer who testified at the evidentiary hearing, indicated that he had been to the house a number of times before and that they had never been confrontational with him. There had never been any kind of physical altercation or any kind of resistance with the officers. They said, he said they had a hard time getting to the bottom of what was going on, but they never, ever had any kind of confrontation. And so, at least according to Officer Schaefer, he did not have that type of fear that you might have in other domestic violence cases. And I see I'm down to two minutes and 27 seconds. Yes. Thank you. Good morning again. You look familiar. My name is Will Taylor. I represent the government in this appeal. So I want to start off by, it's an objective analysis, but Trooper, I'm sorry, Officer Schaefer testified over and over again that he entered to make sure she was safe. And it was based on his history with the couple, as well as the information he had when he went to the scene. So, I mean, he knew he'd been out there before, that they have some sort of volatile relationship. He had had contact with Mr. Legere before, where E.L. had been reported missing. And he was so concerned, he actually called out the homicide detectives. And as he said, he later learned that E.L. had actually just run away and did not want to be found by Mr. Legere. And again, they get a 911 call. So the mother is out of state, so she sends a message to someone who's in state, and they call 911. Then police are dispatched. And so the information they have, you know, at the time is they know there's these kind of competing domestic orders, conditions of release. So, you know, from an officer's perspective, they understand that there's a volatile, ongoing relationship. Okay, but let's fast forward, because as I understand the circumstances, they finally arrest them both, take them out, correct? Or they put them in handcuffs, they remove them both from the house. And then they find the gun. So what justifies the search after everything's been secured, and there's a subsequent search of the house, and they uncover the gun? So, I mean, I tried to cover this. At some point, the emergency is over. So when the defendant initially filed his motion to suppress, when he put in his factual basis, he said, Officer Thielen went into the bedroom with the female to make sure there was no weapons, so she could get her clothes and leave the house. And he said she was dressed, and then the officers left the house. The officers, there was no real evidence presented on this at the evidentiary hearing, because everyone agreed that that was the course of events. And the defendant specifically said officers left the house and obtained a search warrant and returned the next day. So that's not what happened. The officers didn't go in and start rooting around for evidence. Didn't the officer claim that he had to secure the property, and that's when he found the gun? Right, so. What do you mean, secure the property? The two persons are already outside the property. There's no one else there. What's to secure? To secure to make sure no one else goes in to either. You can do that by closing the door. Well, that is what happened. He was securing it from the outside. Don't secure the property by looking around before you close the door. You just walk out and close the door. And that's what I want to cover. That is not what happened. He was not looking around inside the house. Then how did he see the gun? He saw the gun laying on the floor of the bedroom when he had to go into the back bedroom with E.L. so she could retrieve her clothing. I can't very well let her go by herself into a house. Right. And, again, we didn't really cover that issue at the evidentiary hearing because the defendant's motion was very clear. And it even says as a quote, the only issue here is whether the entry was initially lawful. And, again, he even put in his factual basis. The officers went, she retrieved her clothes, they left the house. That is not when a search occurred. And even Officer Schaefer testifies, no, we took them out of the house, we left. In the search warrant when it says Officer Thielen is securing the residence, he's securing it from the outside to make sure other people don't go in. That's what happens while they wait for a search warrant. They want to make sure the house doesn't get burglarized, evidence doesn't get tampered with, and things of that nature. I had the impression that he did a search of the house to secure the property before he left and closed the door. Am I wrong? That's incorrect, Your Honor, yes. Why did he have to accompany Mrs. Lesur into the bedroom? Well, he didn't testify, but, I mean, it's still a domestic violence situation. Mr. Lesur and Mrs. Lesur, and they know where Mr. Lesur is. He's not in the bedroom. So what's the reason why he has to accompany the wife into the bedroom? There is actually a Ninth Circuit case on this, but, again, I didn't cover it. Well, what would prevent her from going in the house and getting a gun? And that's what I think that case talks about, is they want to make sure that neither party obtains a firearm. Remember, they still don't know exactly what's going on. I'm not clear from the record, though, because there seems to be one inference that he saw the gun while he was with her in the bedroom, and then there's another one, he saw it when he was securing the property, which suggests that he was there after the two of them had been removed, and then he looks around and sees the gun. And to me, it's kind of a big difference. That would be a big difference, but that's not what happened, and that's not. Are we confident of that, because it's. . . Doesn't the record show that he went with her to get her clothes? That is what the defendant's motion put as their factual basis, which everyone agreed was the factual order that things happened, is that Officer Thielen went with E.L. to the back bedroom in order to retrieve her clothes. That's where he saw the firearm. The police officers then left and secured the residence and returned later. And then it was later that they returned the search warrant. And, again, if you look at. . . in the residence. Now, maybe that's two separate things. Maybe it's not. It wasn't entirely clear to me that he didn't go back in and secure the residence and see the gun then. So the search warrant, David, I mean, to the extent that you're kind of establishing a fact based on what Officer Foy von Daltern put in, I mean, he's rapidly receiving information as well. But, again, by the time we get to the evidentiary hearing, the defendant's position and everyone's position was that Officer Thielen saw it when he was in the back bedroom while she was retrieving her clothes, then left. And, again, those facts weren't further explored because they weren't really contested. But, again, you know, the argument is essentially from the appellant that, well, couldn't this have been a fake call? But as Snipe says, we will not impose a duty of inquiry on the police to separate a true cry for help from a less deserving call for attention because the delay may cost lives that could have been saved by an immediate police response. And, you know, the reasonableness of the officer's action is judged by a reasonable officer at the scene rather than 20-20 hindsight, understanding that they have uncertain and incomplete and rapidly evolving information. Setting aside the initial entry, even if the evidence that a gun was seen was removed from the affidavit, there's still more than sufficient probable cause to go in and search the residence. That is only 14 or 13 substantive paragraphs which discuss the nature of the investigation. And within that, E.L. provides a very specific account of the assault. She provides a timeline of when it happened. She said what acts occurred to her, how they occurred to her, that a weapon was used, that she was strangled. She provided a specific make and model of the gun. She had a specific account of how the gun was obtained, where it was obtained, and when it was obtained. She also told there's also information on where evidence could be found that would corroborate her account of a sexual assault. She had agreed to undergo the SART examination process. And specifically, she says there's a camera system inside that will have evidence of this. So that alone, if you have someone who said, I have been sexually assaulted, there's a camera system that is going to verify this, that would be enough to get a search warrant. You know, the argument that, well, she could be lying is not enough to defeat a fair probability that evidence of a crime would be found in there. And when you look at the totality of the story, even omitting the fact that a firearm was seen, the search warrant still would have issued. You know, what the search warrant was looking for was any firearms, the cell phone belonging to E.L., which she said, you'll see the text messages where I'm calling for help, the DVR inside the house, you know, any DVR with recordable media, and to take photos. So, you know, this search warrant, the 13 substantive paragraphs that don't include the one-sentence observation from inside the house, would have been enough to issue, even if this court finds that the police shouldn't have entered under the emergency aid exception. Anything further? Thank you for your argument. All right. Thank you, Your Honor. The only thing that was corroborated of Ms. LeSueur's statement that was included within the affidavit is that there was a DVR camera system. Nothing else is corroborated. Her, what they argue is a specific description of an assault, there's no evidence to support that. That he picked her up and brought her to the house, there's no evidence to support that. That he asked her to go by the firearm, there's no evidence to support that. Does there have to be? Yes, because she's not a disinterested party reporting a crime to the officers. She is, one... She's not a C.I. or anything like that. No, she's not, but she's not a third party who's a citizen witness who's witnessed a crime. One, she's there in violation of the domestic violence restraining order. She was there a week or two weeks earlier, again, in violation of the order. What's your best case for if an officer goes out and interviews people and ascertains that someone's a victim of a crime and gets a search warrant based on that, that there has to be a witness, that someone's got to corroborate what they say or something along those lines? Because the Ewing case that's cited in my brief says that citizen witnesses versus C.I.s are treated differently. And Ms. Lesur is neither a citizen witness nor is she a C.I. She is part and parcel of what's been going on. She is also herself a domestic abuser. And she is at the residence in violation of the restraining order. And the officer in question knew that she had mental health issues and that she had previously lied. But any citizen witness can be impeached. You know, I don't know why she's not a citizen witness. I guess because of all the things that I just said, that she's not. Well, because she's an impeachable one and they know all of that and it's not. But so then they need to corroborate at least some of what she said. And they did not do that. And so here, as to the initial entry into the home, it is not clear when or how or why they searched the home. They apparently, according to what the government has said and what was written in the defendant's motion to suppress, an officer escorted Ms. Lesur into the bedroom to get some belongings, but then she didn't get her cell phone, which would have had the evidence that they say would corroborate what occurred, which that was her cell phone. She would have, I would think, every right to take that with her. I may have missed something, but in answer to Judge Callahan's question as to any authority, that there's a corroboration element required. Well, the Ewing case that I cite in my reply brief is not a specific holding, but does go through and distinguish between what they call passerby witnesses or citizen witnesses versus CIs. And there is no specific holding that says there's a spectrum, but this court does discuss what appears to be a spectrum of different types of witnesses. Excuse me. And if you're a citizen witness and have no interest in what's happening and you just provide information to an officer, sure. But when there is a long and storied history between the two parties at issue, then there needs to be some corroboration. Is that a credibility determination to be made by the district court? The district court or the magistrate that signed the search warrant? The magistrate who issues the warrant. It seems like there should be something on behalf of the magistrate judge to seek out additional information to try to determine whether any of the statements that she made were corroborated. It seems to be a requirement. The Ewing case is the best case you can give us. Yes. Okay. Thank you. Thank you, counsel. Thank you. The case just presented will be submitted for decision. Thank you both for your arguments today.
judges: Thomas, Callahan, Bea